UNITED STATES DISTRICT COURT          SOUTHERN DISTRICT OF TEXAS

Metroplexcore, LLC,                     §
                                        §
            Plaintiff,                  §
                                        §
versus                                  §          Civil Action H-10-669
                                        §
Sallye Perrin, et al.,                  §
                                        §
            Defendants.                 §

## Opinion on Summary Judgment

1.    *Introduction.*

An environmental engineering company sued a general contractor for payment on a light-rail project. Because Metroplexcore was not awarded a job, did not work on it, and had no contract with Metro or Parsons, it will take nothing.

2.    *First Contract.*

In May of 2006, the Metropolitan Transit Authority of Harris County hired Omega Engineers to design part of a passenger rail-line in Houston. Omega and Metroplexcore (Core), a Houston environmental engineering company, formed Team Express with a third contractor. During the next ten months, Core worked on the project and was paid almost $900,000. Parsons Transportation Group, a Los Angeles engineering and construction company, had no role in this phase.

3.    *Second Contract.*

In August of 2006, Metro solicited bids to build and operate the line. Contractors had to bid for the entire project. It had three parts: design, construction, and maintenance after it

was operating. Metro would accept the bidder that it ranked the highest, but it could switch to the second bidder if the first contractor could not fully qualify for the project.[1]

Parsons assembled the Houston Transit Solutions Team. It included a joint venture between Parsons and Manhattan Construction Company to design and build the line. Veolia Transportation Services – a French operations company – and Kellogg, Brown & Root – a Houston engineering and construction company – were included as "major participants." After construction, Parsons and Veolia would run the line.



---

[1] Tex. Transp. Code § 451.807 (West 2005).

Core and 20 other subcontractors were included as "team members" – two were "major subcontractors," 14 were "small and disadvantaged businesses," and the others were "sub-consultants" or "specialty firms."[2] Metro used these labels to identify its clusters of subcontractors. Metro understandably wanted assurance that the general contractor had recourse to the variety of skills needed. The disclosure of these companies was a way for Metro to identify the potential general contractor's ability to accomplish the work.

Parsons submitted its bid to Metro in September and began assembling its team of subcontractors. While negotiating with Core, Sallye Perrin, a vice president at Parsons, wrote it a letter. It said that if Metro accepted Parsons's bid, Core would (a) "manage" the geo-technical and hazardous-material matters, (b) be "mentored" by Veolia, and (c) "participate" in 10 percent of Veolia's contract with Parsons.[3]

After it had reviewed the proposals, Metro ranked Washington Group International – a Boise construction firm – first and Parsons second. In January of 2007, Metro accepted Washington's bid. It included Granite Construction, Rust Constructors, and Stacy & Witbeck as important contractors. At Metro's request, Parsons extended its proposal until May; when May passed, its proposal expired, and its team dissolved. That same month, Metro awarded Washington a $77-million contract for the first phase of the second contract.

The next month, Washington awarded a $5-million subcontract to Omega extending its first one from 2006. As one of Omega's subcontractors, Core worked on the line during the next ten months and was paid more than $1.5 million as part of the Washington team.

4.     *Third Contract.*

By March of 2008, Washington had designed 60 percent of the line, but it could not qualify for the rest of the project. Metro ended its contract with Washington.

Metro asked Parsons to replace it; they negotiated. Two months later, Metro awarded Parsons a $1.4 billion contract for the modified project.

---

[2] Houston Transit Solutions's Prop., Doc. 49-6.

[3] Letter from Sallye Perrin to Willard Jackson, Jan. 10, 2007, Doc. 1.

By this time, the scope of the work had significantly changed, and Parsons assembled a new team of subcontractors. To ease the transition, Metro recommended that Parsons keep some of the Washington team.[4] Metro did not recommend that Parsons keep Omega or Core.

Parsons's new proposal included a joint venture called Houston Rapid Transit among Parsons, Granite, Stacy & Witbeck, and Kiewit. Both Granite and Stacy & Witbeck had been contractors for Washington. On the other hand, Parsons did not keep Manhattan – a company that it had originally included as the principal builder.

Metro awarded Parsons's Houston Rapid Transit a contract to finish the design and build the line, and it allocated $25 million to Granite. During the next year, Parsons continued negotiating with subcontractors for jobs, but it did not include Core or many others from its original bid.

Six months later – 608 days after Metro awarded the new contract to Parsons and without Core having done work – Core asked Parsons for an accounting and its ten percent of the revenues from the project. Parsons told Core what it already knew: that Core was not part of its new proposal and only contract. Core responded by suing Parsons, Metro, and Sallye Perrin – a Parsons executive – for (a) breach of contract, (b) promissory estoppel, (c) negligent and intentional misrepresentation, (d) quantum meruit, and (e) a declaratory judgment that it had a contract with Parsons and Parsons breached it. Core later abandoned its claims against Metro, and its claims against Perrin were dismissed.

5.      *Parsons's Original Bid.*

Core pleaded that it had (a) a contract or (b) a promise of a contract or (c) some other agreement with Parsons to work on the project. [5] Six months later, it asserted that they had formed a joint venture entitling Core to 10 percent of Parsons's contract with Metro.[6]

Parsons had been clear about Core's role in its bid to Metro. It listed Core as a "team member." It described it as a "sub-consultant" that "specializes in environmental, waste

---

[4] Mem. Negs. 5110, Doc. 49-29.

[5] Org. Pet., Doc. 1; Am. Comp., Doc. 29; Sec. Am. Comp., Doc. 43-2.

[6] Resp. to Mot. Summ. Judg., Doc. 63.

management, and water resources."[7] While the scope of Core's work had not been negotiated, Parsons's bid did not call it a joint venturer, partner, or even major participant. It was a potential sub-consultant. Whatever the reason for initially including Core, Parsons was not obliged to use it in other proposals. When Metro rejected the bid that included Core, it ended. The contract went to Washington.[8] Core eventually had a sub-subcontract under the Washington bid.

6.      *Parsons's Negotiations with Core.*

        A.  *Letter.*

        Core relies on a letter written by Perrin to support that it had a contract or a promise of one. The letter is brief.  It says that "in the event" Metro accepts Parsons's bid:

> (a) Core would "manage all of the geo-technical and hazardous material work" for phase one,
>
> (b) Veolia would "mentor" Core for phase two, and
>
> (c) Core would "participate" in Veolia's contract with Parsons "to a minimum 10% level."[9]

Before the letter would bind Parsons to whatever it had said, Metro had to accept Parsons's bid. That condition precedent failed. When it failed, Core began to work under Washington, abrogating Parsons's obligation on its bid negotiations.

Perrin wrote the letter to Core to "confirm their conversations" in the negotiations.  It was a proposal – a recruitment effort for one of the subcontractors Parsons would need. It was an indication of Parsons's intentions at that stage. It does not specify the scope of the work, dates, prices, costs, personnel, or other terms and conditions needed to create a binding contract.[10] Had the bid been accepted by Metro, Parsons could not have required Core to do a particular act for a specific price. It had no mutuality. Core had paid nothing, committed nothing, and changed nothing.

---

[7] Solutions's Prop., Doc. 49-6.

[8] § 451.807.

[9] Letter, Doc. 1.

[10]*Moore v. Dilworth*, 179 S.W.2d 940 (Tex. 1944).

Core knew also that its participation in the contract was dependent on the permission of Metro, changes in the work, and all of the vagaries of major construction projects.

The participation requires separate agreements between Parsons and Veolia and then between Parsons or Veolia and Core. Parsons had proposed that Veolia mentor Core – giving it "technical guidance and expertise" – because Core could not do the job on its own.[11] In effect, the president of Core insists that Parsons's abstract declaration of a plan to include Core as a participant in its contract with Veolia entitles Core to ten percent of the profits from Parsons's contract with Metro. This has no support in the letter or anything else.

Had the letter created an enforceable promise, it would have been conditioned on Metro's accepting Parsons's bid. Metro never did.

B. *Talk.*

Core relies on testimony from people who say that Perrin "said" things while assembling Parsons's teams in 2007 and 2009 "leading" Core to "conclude" that it would work for Parsons. Among themselves, they cannot decide what they thought Perrin had promised. Zia Qureshi, the president of Core, says that Perrin "assured" him that Core would be either a "management partner" or "team player." [12] Willard Jackson, its owner, says that she "committed" to him that Core would be an "actual partner" or something "in the nature of a joint venture" or "part and parcel" with Parsons.[13]

First, whatever the talk was, Parsons did not get the job at the time of the bid. Second, if the talk was part of Parsons's preparation for picking up Washington's work, what the people from Metroplexcore recall is neither factual nor consistent. The affidavits are worthless. They contain mostly hearsay about what a vice president at Parsons said during negotiations with Metro about Core and to Core directly. Negotiations are not contracts; they are not representations of anything except the bidder's position at the time. When an agreement has been reached, the parties sign a document with the specifications that are essential to the

---

[11] Solutions's Prop. 1696, Doc. 49-6.

[12] Qureshi Dep., Aug. 6, 2010, Doc. 44-3.

[13] Jackson Dep., Aug. 20, 2010, Doc. 55.

exchange. The principals of Core cannot create a fact dispute by contradicting themselves. Speculation about what Perrin might have intended is empty.

James W. E. Dixon, II, a member of Metro's board at the time, swears that Perrin "assured" him that Core would be a "principal or a prime partner" or be "associated as one" with Parsons.[14] Unfortunately for Dixon, Metro's memorandum of negotiations does not mention Core, and what it does say contradicts Dixon's recollection.

If Perrin committed to Dixon that Parsons would include Core, Dixon should have seen that that promise was in the contract that he voted to approve for Metro. He swears that he relied on oral side commitments to benefit Core and voted to approve the contract with Parsons. Recast into plain language, Dixon has sworn that he voted for Parsons to get the contract because it had promised to include his friend's company. There is an ugly word for that. Besides the talk, Perrin's letter is the only basis for Core's contract claim, and it is about the contract that went to Washington. Dixon may not impeach the public contract that the agency he served entered – with either Washington or Parsons.

Even if the negotiations between Parsons and Core amounted to an oral contract, it would not be enforceable.[15] The contract Metro awarded to Parsons would take at least 20 years to complete. Any significant component of it would require more than a year to accomplish. It included designing, building, and then running the rail-line for 15 years.[16] Any job Parsons allocated to Core through Veolia could not have been completed within one year from whenever Core thought that they had formed a contract. It would take years for Core to work on phase one, and its participation in Veolia's contract during phase two could last until at least 2025.[17]

Core had hoped that its negotiations with Perrin would culminate in a contract with Parsons. They did not. Parsons entered a 77-page contract with Metro, a 24-page contract with

---

[14] Dixon Dep., Aug. 9, 2010, Doc. 32.

[15] Tex. Bus. & Com. Code § 26.01(b)(6) (1977); *Hall v. Hall*, 308 S.W.2d 12 (Tex. 1957).

[16] Solutions's Prop. 1700, Doc. 49-6.

[17] Solutions's Prop. 1693, Doc. 49-6.

Manhattan, and a 10-page contract with Veolia.[18] These numbers of pages do not include all of the documents that are included by reference, like the drawings and details of the work that are in Metro's request for proposals. Parsons did nothing but talk with Core for its proposals – write it a 163-word letter about the first one and talk with Core about its potential participation in the second one. It signed no contract with Core. An indication of an intention to use a subcontractor when a bid might be awarded is not a contract without more, a lot more.

7.      *Parsons's Second Proposal.*

Core says that it was included in Parsons's only bid by the letter. It says that if Parsons negotiated a second proposal, Metro wrongfully accepted it because it should have re-done the entire bidding.

Core's status does not allow it to complain about the bidding. It never submitted a bid to Metro, either time. It has always been an available resource for general contractors. It has not been hurt by Metro's accepting a different subcontractor for the modified project to replace the failed general contractor. Core had nothing to lose. It sacrificed nothing by negotiating with Parsons. It had hoped to be included in Parsons's second proposal, but it was not. That is not an injury.

In the sense that Core lost the opportunity to work on the project, it is in the same position as every other subcontractor that Parsons excluded from its original bid. Companies draft proposals, real estate agents haul people from house to house, manufacturer's representatives study customer companies, and shoe salesmen show dozens of pairs all in the hope that they will reach a deal. If not, the time and other expenses are costs of their operations.[19] Parsons was shopping for qualified subcontractors for its bid and during its later negotiations with Metro.

Being a contractor and having had at least two subcontracts for the project, Core misstates how bidding works. The regulations say that if Metro is unable to negotiate a contract with its selected contractor, it must end its negotiations in writing and begin negotiating with

---

[18] Contract No. RA0800017, Doc. 49-30; Joint Venture Agmnt., Doc. 49-3; Mem. Understanding, Doc. 49-4.

[19] *See Robertson v. Melton*, 115 S.W.2d 624 (Tex. 1938).

the second highest-ranked contractor.[20] Although Metro accepted Washington's bid on the whole project, it had contracted with it for design only. When Metro was unable to agree with Washington for the next steps, it turned to Parsons. Metro did not revive the original bids. It asked the second bidder – Parsons – to accept a negotiated contract to replace the failed first bidder and complete the remaining work.

In those negotiations, Metro changed the work and had preferences for subcontractors. It had a legitimate interest in an efficient transition. Metro followed the rules by ending its contract with Washington and negotiating with Parsons until they agreed on the new one.

Because the project had changed, Parsons was not bound by its original bid. Even if it had been, it could have removed Core from it. The regulations allow contractors to exclude major participants or key people from their bids with the written consent of Metro, and they may change others on their own.[21] Parsons could have removed Core as a minor participant – a subconsultant – without Metro's approval.

By the time Metro approached Parsons, Washington had worked on the project for one year. It had designed 60 percent of the line and light-rail technology had changed. Metro removed one terminal, had more money, and had already been using important subcontractors.[22] To save time, Parsons submitted a new proposal that included many subcontractors from Washington's team. Parsons no longer needed work from Core, and it removed it as a potential subcontractor from its team. Metro adhered to the regulations and chose the most effective way to proceed.

8.   *No Damages.*
      A.  *No Work.*

Damages for breach of a contract are normally measured by an injury that arises directly from the terms of the contract – a particular loss caused by the breach – like lost profits or having paid a brokerage fee in performance of the contract. When these amounts cannot be

---

[20] § 451.807.

[21] Metro's Req. Qualifications 26, Doc. 33.

[22] Mem. Negs. 5110, Doc. 49-29.

reliably determined, the law allows damages to be measured by "expenditures" incurred while preparing work to perform an awarded contract that is later breached.[23]

      (1)    *Opportunity.*

Core says both that it was denied the opportunity to work on the rail project and it should be paid for the work that it did for Parsons. Core cannot articulate with engineering, accounting, or legal precision (a) what it did for Parsons, (b) under what authority, and (c) what it spent in preparation or performance.

By initially turning down an offer from Washington for Parsons, Core says that it lost money. That was a unilateral choice, a policy decision, by Core. Core decided to join Parsons, and Metro selected Washington. Those are risks of bidding. They are not part of a contract or guaranty. Core eventually worked as a sub-subcontractor for Washington and was paid – mooting its claim of lost opportunity.

      (2)    *Lobbying.*

Core brags that its "prominence," "superb work," and "very close working relationships" with Metro secured the contract for Parsons – an "unknown" in Houston.[24] If Parsons hired a subconsultant less qualified than Core or incompetent, the consequences of that decision are between Parsons and Metro.

Core asserts that it worked its political relationships, creating goodwill for Parsons. It could have convinced Parsons to retain it as a lobbyist – well, if it were not barred by Metro's rules.[25] Core had no contract for this work, and the effort was unsuccessful. If Core had paved the way for Parsons against Washington, Metro would have accepted Parsons's bid. Metro would have asked Parsons to include Core in the second proposal or at least investigated why it had been excluded. Metro did not.

Core says that it spent time lobbying in 2007 for Parsons's bid by meeting with Metro board members, Representatives Sheila Jackson Lee and Al Green, and other "significant

---

[23] Restatement (Second) of Contracts § 349 (1981).

[24] Jackson Dep., Doc. 55; Qureshi Dep., Doc. 44-3.

[25] Metro's Req. Qualifications 26, Doc. 33.

minority leaders."[26] Core does not identify the others or say how many times they met, what they talked about, or why their meetings failed to win Parsons the contract.

The "work" that Core says it did was part of bidding. It was sales talk in the hope of a contract – an expense for an opportunity that it lost in common with all the other potential subcontractors.

      (3)   *Assignment.*

The president of Core says that Perrin assigned it a job during a meeting in June of 2009, but he contradicts himself by later saying that they only met to discuss possible work assignments. After the meeting, he sent a chart to Perrin of work that Core could do for Parsons. Had Core already received a specific job, the chart would have been unnecessary. He says that Perrin sent him e-mails confirming the assignment, but now says that he cannot produce them because he has since changed computers.[27]

Core was not awarded a job, and it worked on the rail project for neither Parsons nor Parsons's subcontractors. Core did work for Omega and Washington and was paid.

    B.  *No Reliance.*

Core cannot articulate what it thought Parsons had promised to it, yet it says that it relied on it and was injured. It complains that it lost money by keeping employees that it otherwise would have fired in anticipation of the project. It does not know and has no records of these idled but paid workers. It cannot reliably say how many workers it retained, how they were paid, or what justified their retention, especially in these years of a slow market for construction. The president swears that Core kept four to six workers that cost it $240,000 to $480,000. Next, he says that it kept "technical professionals" costing it "six-figure amounts."[28] Its owner then swears that Core kept 10 to 15 workers costing it $1 million to $3 million.[29]

---

[26] Jackson Dep., Doc. 55.

[27] Qureshi Dep., Doc. 44-3.

[28] Qureshi Dep., Doc. 44-3.

[29] Jackson Dep., Doc. 55.

Parsons never asked Core to keep workers, hire new ones, or do anything in anticipation of future work. It never awarded Core a contract; it could not have asked Core to prepare working on something that had never been defined.

Core says that it did not accept other work while waiting for Parsons to assign it a job. It says this cost it $2 million. Whatever the reason for Core's not working – waiting on Parsons or not being awarded jobs – that was its choice. Core divested itself of its interest in Team Express in 2009. It blames this on Parsons. [30] Core had done work with Omega and then – without asking Parsons – did work for Washington, apparently under Omega. It did not lose other opportunities by waiting for Parsons; it went on with its business. [31]

In its claim for damages, Core does not account for the money that it earned elsewhere – from Washington or others – during the 20 months between Parsons's proposals. In its three complaints, Core never pleaded that it had formed or had agreed to form a joint venture with Parsons, but in its response to Parsons's motion for judgment eight months later, it says that its role was to be a joint venturer – not an environmental-engineering subcontractor, minor participant, sub-consultant, or significant player. Although joint ventures may be less formal than a partnership, limited liability company, or corporation, they must be defined with some precision by the members of it. People work together on projects large and small to both their benefits without becoming an entity with enforceable reciprocal obligations.

Had Parsons asked Core to divest itself of its interest in Team Express, it would have done so in 2007 when, according to Core, they had formed a joint venture for the project. Whatever the reason for its divestiture, it was Core's decision unrelated to acts by Parsons.

10.   *Conclusion.*

Core has pleaded several theories without support. It has named improvident parties and larded the record with vague, inconsistent, and factless assertions about what others thought and self-congratulatory endorsements of itself as an insider. It has inexplicably missing records of business correspondence and finances – records available secondarily from its customers or

---

[30] *Id.*

[31] *Southmark Corp. v. Life Investors, Inc.,* 851 F.2d 763 (5th Cir. 1988).

other third parties. The documents that do exist negate its claims. If it had a contract to participate in the whole project, it would have needed to have been in writing.

Core had no contract with Parsons – not to venture jointly or to build the line for Metro. It did no work on the project under Parsons's contracts with Metro. It did not rely on anything Parsons said. Core tried and failed to be included in a new consortium over a year after the rejection of Parsons's original bid and the failure of Washington.

Metroplexcore, LLC, will take nothing from (a) the Metropolitan Transit Authority of Harris County by abandonment, (b) Sallye Perrin for failure to state a claim recognized at law against her, and (c)Parsons Transportation Group.

Signed on July 3, 2012, at Houston, Texas.

Lynn N. Hughes
United States District Judge